UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
NAFTASERVICE TRADING (CYPRUS) LTD.,

                           *Plaintiff,*

v.

ALARIC CO. LTD. and ALARIC CONSULTING
& INVESTMENT CORPORATION LIMITED,

                           *Defendant.*
--------------------------------------------------------x

**08 CV 0317 (SAS)**

**AFFIDAVIT IN SUPPORT
OF RENEWED MOTION FOR
DEFAULT JUDGMENT**

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | |
| | ) | ss.: |
| COUNTY OF NASSAU | ) | |

       George M. Chalos, being duly sworn, deposes and says:

       1.     I am a member of the Bar of this Court and am a member of CHALOS & CO., P.C., attorneys for plaintiff in the above-entitled action and I am familiar with all the facts and circumstances in this action.

       2.     I make this affidavit in support of Plaintiff's motion to renew its' prior application for the entry of a default judgment against defendants, ALARIC CO. LTD. (hereinafter "ALARIC") and ALARIC CONSTULING & INVESTMENT CORPORATION LIMITED (hereinafter "ALARIC CONSULTING").

       3.     This is an action to recover, inter alia, US $937,116.81, plus interest, attorney's fees, costs and expenses, undisputedly owed by defendants, ALARIC and ALARIC CONSULTING, to Plaintiff.

4.    This Court has jurisdiction by virtue that the underlying claim herein is an admiralty and maritime claim with the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and with the admiralty and maritime jurisdiction of this Court under 28 U.S.C. §1333.

5.    This Court also has jurisdiction of the subject matter of this action by virtue of the Federal Arbitration Act, 9 U.S.C. §§1, *et seq.*, particularly, 9 U.S.C. §9.

6.    This action was commenced on or about January 14, 2007 by the filing of the Verified Complaint to obtain Process of Maritime Attachment and Garnishment. (*See* Docket #1).  A copy of the Verified Complaint was served on the Defendants, ALARIC and ALARIC CONSULTING, on or about April 16, 2008. (*See* Docket #17).

7.    On April 15, 2008, USD$215,000 of funds belonging to defendants were attached at HSBC (USA).

8.    Prompt notice of the attachment was given to the defendants on April 16, 2008 (*See* Docket #17). An affidavit of service was filed with this Court on July 11, 2008.  (*See* Docket #17).

9.    On or about July 14, 2008, Plaintiff submitted its motion for default judgment.

10.    On or about July 31, 2008, the Honorable Judge Scheindlin issued an order denying the motion for default with leave to renew.  *See* Docket #19.

11.    The essence of the Court's denial of the motion for default judgment was that the Court found it unclear whether service of process had been completed by Plaintiff upon defendants in accordance with Rule B(2).

12.    In order to allow Plaintiff an opportunity to clarify this inquiry, Judge Scheindlin wrote: "Naftaservice may choose to file an amended affidavit of service to indicate, if accurate, that delivery of the documents was made using a form requiring a return receipt.  In such case,

the Court will grant the motion for default judgment but stay its entry until the London Arbitration has concluded." *See* Docket # 19, at p. 3, fn 6.

13.     Thereafter, on or about August 4, 2008, undersigned counsel filed an amended Affidavit of Service confirming that service had been made at defendants principle place of business in accordance with the requirements of Rule B(2), and that an individual named "Agus" signed for receipt of the parcel on April 21, 2008 at 11:31 am. *See* Docket #20.

14.     Since such time, the Defendants, ALARIC and ALARIC CONSULTING, have not answered, moved, or otherwise appeared in this action, and the time for the Defendants to answer has long expired. To date, there has been no request by Defendants for an extension of time in which to answer, move, or otherwise appear in the present proceeding.

15.     Additionally, since such time, Plaintiff has obtained a favorable Award from the London Arbitration tribunal awarding Plaintiff, inter alia, USD1,388.461.11, together with interest at the rate of 6% per annum and pro rata compounded quarterly beginning January 15, 2008.

16.     A true and complete copy of the London Arbitration Award is attached hereto as Exhibit A.

17.      The parties against whom a default is sought is not an infant, in the military, or an incompetent person.

18. A proposed order for default judgment is attached hereto as Exhibit B.

**WHEREFORE**, the Plaintiff requests the entry of Default Judgment against Defendants, ALARIC and ALARIC CONSULTING, and that a judgment of the Court be granted in Plaintiff's favor; that garnishee bank, HSBC Bank hereby pay to the order of the

Plaintiff USD$ 215,000.00 representing the funds belonging to defaulting defendants which were restrained pursuant to the Order for Issuance of Process of Maritime Attachment and Garnishment issued by this Court on January 15, 2008, in partial satisfaction of the Plaintiff's claims; and that defendants, ALARIC CO. LTD. and ALARIC CONSTULING & INVESTMENT CORPORATION LIMITED, pay the costs and reasonable attorney's fees associated with this Verified Complaint, all together with post-judgment interest.

Dated: August 13, 2008
      Oyster Bay, New York

                              Respectfully Submitted,

                              For Plaintiff,
                              NAFTASERVICE TRADING (CYPRUS) LTD.

By:           _____

                              George M. Chalos (GC-8693)
                              123 South Street
                              Oyster Bay, New York 11771
                              Tel: (516) 714-4300
                              Fax: (866) 702-4577
                              Email: gmc@chaloslaw.com

Sworn to before me this 13th
day of August 2008.

_____
Notary Public

      **GRACE M. HEANING**
**Notary** Public, State of New York
      No. 01HE6069529
     **Qualified** in Nassau County
**Commission** Expires Mar. 9, 2010

# Exhibit A

12/08/2008  19:12    01245361093                    ATTICA ASSOCIATES                    PAGE  02

# m.t. "TROODOS"

## Charter Party dated 9th October 2007

## FINAL ARBITRATION AWARD

## IN THE MATTER OF THE ARBITRATION ACT 1996

## AND

## IN THE MATTER OF AN ARBITRATION

## BETWEEN

## Naftaservice Trading (Cyprus) Ltd.
## of Cyprus

Claimants
(Disponent Owners)

## AND

## Alaric Consulting & Investment Corp. Ltd.
## of Malta

Respondents
(Charterers)

### m.t. "Troodos"

### Charter Party dated 9th October 2007

### FINAL ARBITRATION AWARD

### WHEREAS:

1.  By a Tanker Voyage Charter Party on an "Asbatankvoy" form, with amendments and additions, concluded on 9th October 2007 (hereinafter referred to as "the Charter Party") the Claimants (hereinafter referred to as "the Owners") chartered the motor tanker *"Troodos"* (hereinafter referred to as "the vessel") to the Respondents (hereinafter referred to as "the Charterers") to load a cargo of *"CRUDE OIL/FO/FO .....MIN 4550 MT CHOP TO FULL CARGO"* for 2 consecutive voyages with loading *"1SP/SB MISURATA, LIBYA"* and discharge *"1SP/SB MALTA"* with laydays 14th and cancelling 16th October 2007.

2.  The fixture was evidenced by an undated e-mail recapitulation on the terms and conditions more particularly set out in that e-mail message. In the event, the *"Troodos"* loaded in Misurata between 14th and 20th October 2007. However, the vessel was detained in Misurata by the Libyan authorities and was eventually ordered by those authorities to discharge the cargo there, an operation which was completed on 6th January 2008.

12/08/2008  19:12   01245361093          ATTICA ASSOCIATES                    PAGE  04

According to the Owners, on the date of their Claim Submissions [6th June 2008] the vessel was still detained in Libya.

3.  The Asbatankvoy Charter Party provided for arbitration in London with the following clause:-

---

**" PART II CLAUSE 24 – ARBITRATION**

*Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city above-mentioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises."*

---

The fixture recapitulation also included *"GA/ARB LONDON, ENGLISH LAW"*

4. Disputes having arisen, the Owners appointed me, the undersigned Timothy Rayment of 47 Castelnau, London SW13 9RT as the arbitrator nominated by them. The Charterers having failed to appoint an arbitrator on their own behalf within the time allowed despite having been put on proper notice so to do, the Owners appointed me, the undersigned Timothy Marshall of Global House, 61 Petty France, London SW1H 9EZ as the second arbitrator in accordance with the provisions of Clause 24 of Part II of the Charter Party. In turn we, the first two arbitrators appointed under the Charter Party, appointed me, the undersigned Colin Peerless of Bywater House, Littley Green, Chelmsford, Essex CM3 1BU as the third arbitrator to complete the Tribunal.

5. In accordance with section 3 of the Arbitration Act 1996 the seat of the arbitration is in England.

6. The Tribunal notified both parties by fax on 25th January 2008 that its composition had been completed by the appointment of the third arbitrator. In that message, the Tribunal explained to the Respondent Charterers that it was customary in London arbitration for Defence Submissions and any Counterclaim Submissions to be served within 28 days of the service of the Claim Submissions. The Tribunal also offered advice to the Respondents on the procedure of the arbitration thereafter and, specifically, pointed out that *"English law provides for a Tribunal to proceed to its Award on the claimants' documents and submissions alone (providing a case has been made out) if the Respondents (yourselves) refuse or fail to take part in the arbitration."*.

7. The Owners were represented in these arbitration proceedings by their legal representatives (hereinafter referred to as "the Owners' solicitors"). The Charterers were not represented and, as appears below, played no active part in the reference.

8. The particular dispute referred to the Tribunal concerned the Owners' claim for:
   1) Demurrage in the amount of US$444,086.81;
   2) Freight in the amount of US$105,000.00;
   3) Detention in the amount of US$805,635.42;
   4) Port disbursements in the amount of US$139,350.00;
   5) Damages in the amount of US$105,000.00; and
   6) Interest and costs.

12/08/2008  19:12    01245361093    ATTICA ASSOCIATES    PAGE  06

9. By a invoice dated 25th October 2007, the Owners presented their first claim for demurrage
   to the Charterers in the amount of US$44,000.00, being 8 days demurrage from 20.00 hours
   on 14th until 20.00 hours on 25th October 2007 at the agreed Charter Party rate of
   US$5,500.00 per day. This period also included the allowed laytime of 72 running hours. On
   30th October 2007, the Owners sent a further claim for demurrage in the amount of
   US$70,659.72 for 12.8847222 days between 18.40 hours on 17th until 15.00 hours on 30th
   October 2007.

10. Similarly, on 20th November 2007, the Owners sent another demurrage invoice for
    US$116,187.50 for the period of 33.972222 days between 18.40 hours on 17th October until
    18.00 hours on 20th November 2007. This action was repeated by the Owners on 10th
    December 2007 for US$296,847.22 for demurrage up to 18.00 hours on 10th December and
    again on 25th December 2007 in the amount of US$379,347.22 for 68.972222 days
    demurrage up to 18.00 hours on 25th December 2007..

11. On 12th November 2007, the Owners' solicitors sent an e-mail to the Charterers in which
    they pointed out that no payment for demurrage had been made as of that date. They further
    expressed concern at the delay then taking place and noted that the vessel had completed
    loading *"a long time ago – on 20th October 2007"*. The letter also noted that the Owners
    had *"a right of lien on the cargo for unpaid freight, deadfreight, demurrage and costs,
    including attorney fees."*. They warned that *"Should there be any further problems with this
    voyage we shall advise our clients to exercise their right of lien. In this case they would
    discharge the cargo into a shore storage and sell it in order to recover their losses."*.

12. It appears that there was no response from the Charterers to that e-mail because, on 13th
    November 2007, the Owners' solicitors sent a further e-mail to the Charterers, repeating
    their request for clarification of the situation and stating that unless they heard from the
    Charterers within the next three days, they would investigate the possibility of exercising the
    Owners' lien by discharging the cargo into a shore facility. In the same message, the Owners'
    solicitors requested the Charterers to comment on the Owners' belief that there may be a
    problem with the cargo and that perhaps the Charterers could not sell or transport it. Finally,
    they advised the Charterers that the Owners had received the D/A invoice in respect of port
    charges, penalty and agency fees in the amount of US$139,350. They further averred that
    *"all such costs incurred by our clients as a result of your failure to give instructions to
    proceed with the voyage will be borne by you."*.

13. On 14th November 2007, the Charterers responded to the Owners' solicitors, by e-mail, and
    advised that *"after the matter was cleared from court procedures, M/V Troodos will*

12/03/2008  19:12    01245361093    ATTICA ASSOCIATES    PAGE  07

*hopefully sail out of Misurata tomorrow the 15th November. Regarding the stated port charges, penalty and agency fees of US$139,350 we are advised that up till yesterday, the amount is US$200,000. This charge will be paid by us/supplier of cargo. The freight invoice and the demurrage will be paid by Alaric [the charterer] as per charter party on arrival of vessel in Malta and prior to discharge.".*

14. The Owners' solicitors responded to the Charterers' message on 15th November to advise them that the Owners had received no instructions for the vessel to sail and requested that such instructions should be given today [15th November]. They reiterated that the Owners were greatly concerned with the situation.

15. In response, on 16th November, the Charterers stated that *"the vessel will be allowed to sail from Misurata on Saturday 17th November 2007."*.

16. In a message dated 20th November and apparently from the brokers in the fixture, they quoted a further message from the Charterers which stated, inter alia, that *"The Court has judged in our favour and the time for appealing on the judgement has now expired."*. They promised a copy of the ruling in Arabic and would send the Owners an English translation as soon as possible. They further stated that *"the ship should sail within 24 '48 hrs."*.

17. The translated judgement duly followed on the following day and it was claimed that the vessel would sail tomorrow [22nd November 2007]. That judgement ended with a ruling that *"orders the concerned Authorities .......... to immediately release M.V. 'rodos (sic) and allow her to sail and leave Libyan territorial waters, with immediate effect."*

18. In spite of that judgement, it appears that the vessel did not leave Misurata and the Owners' solicitors again sent an e-mail to the Charterers on 23rd November, advising that the Owners had issued another demurrage invoice on 20th November, as above, but no payment had been received. They also pointed out other costs such as agency fees, penalty, port disbursements and legal costs continued to accrue every day and, unless the vessel sailed from Misurata by 8 a.m. local time on Monday, 26th November, they would advise the Owners to *"take all the necessary steps in order to protect their interests including, but not limited to, exercising of lien upon the cargo."*.

19. On 26th November 2007, the Owners' solicitors sent a further e-mail to the Charterers asking whether, following the court judgement, the vessel was still under arrest. They repeated their previous warnings about the failure of the Charterers to pay any demurrage to date and also advised that they were investigating, with local lawyers in Libya, the possibility of exercising

a lien there. The final paragraph of this message stated that *"in the absence of your positive reply and payment of the demurrage we shall believe that you have abandoned the cargo on board the vessel and we shall act accordingly without any further notice to you."*.

20. The response from the Charterers was contained in an e-mail to the Owners' solicitors dated 26th November in which they stated that the Court had confirmed that the vessel/cargo was not under arrest. However, there had been an objection from the Public Prosecutor and this was being investigated. They concluded the message with an assurance that *"Regarding the demurrage we will full fill (sic) all our obligations in accordance with the charter party of 09.10.07."*.

21. On the same day, by an e-mail to the Charterers, the Owners' solicitors advised that the Master of the vessel had requested the return of the ship's documents then held by the Port Authorities. He was advised that those documents would not be released *"although they have no claim against the vessel."*. However, the authorities did advise the Master that the Customs had a claim on the cargo in an amount over US$900,000. The Owners' solicitors further warned the Charterers that the vessel was running out of diesel fuel and that the Owners could not afford to buy bunkers in view of the Charterers' failure to pay any demurrage due.

22. Amongst other documents attached to the Claim Submissions were several translations from the Arabic relating to later events. The first, dated 29th December 2007, was from the Great Socialist Peoples Libyan Arab Jamahiriya General Peoples Committee of Justice, signed by the Head of Public Prosecutor and addressed to the head of Customs Authority at Misurata port. This document referred to *"the current action of smuggling heavy fuel oil on board MT/TROODOS …. regarding discharging the quantity of the heavy oil."*. It went on to state that there had been no facility to discharge the cargo ashore until that date due to maintenance but that they confirmed the agreement *"for Brega Petroleum Marketing Company to discharge the loaded quantity of the heavy fuel oil on board (MT/TROODOS) and selling to avoid any damages….."*.

23. On 3rd January 2008, by a translated document from the Misurata Oil Store of Brega Petroleum, they confirmed that they would allow the vessel to berth on that day *"to discharge her consignment after MT/Anwaar Africa sails from the berth."*.

24. On 12th January 2008, in a further translated document from the President of the Prosecution, they confirmed that they were detaining the vessel as a guarantee for the lawsuit but that the cargo had been discharged.

12/03/2008  19:12    01245361093              ATTICA ASSOCIATES                        PAGE  09

25. On 14th January 2008, a translated document advised that, under Customs Law No. 67/1972, Article 122, there would be a fine *"with maximum limit three one the due customs fees plus three times the value of the goods or an amount of One Hundred Dinars, whichever is the greater, or by imprisonment for a period not exceeding six months or by the two punishments together. ..... the court may judge to confiscate the goods subject of the contraband ..... may also judge to confiscate the transport means..."*. They did not state, however, specifically to whom these punishments would be applied.

26. In a further document headed Decision of Indictment in the felony No. 2007/3, dated on what appears to have been 3rd April 2008 [poor copy], a number of names appeared on a list of Indicted persons, all of whom were resident in Libya. However, the name of the vessel and that of a representative of the Charterers [a Mr. Paul Hilli (sic)] were mentioned in the various paragraphs that set out the indictments.

27. On 6th June 2008, the Owners' solicitors served the Claim Submissions, together with supporting documents, and these were copied by fax to the Charterers.

28. On 4th July 2008, the Owners' solicitors advised the Tribunal, with a fax copy to the Charterers, that no Defence Submissions had been made.

29. On 6th July 2008, by e-mail to the Charterers, the Tribunal made an Order that their Defence Submissions, together with counterclaim, if any, be made by 14th July 2008 Failing such service, the Tribunal stated that they would look sympathetically on any application for a Final and Peremptory Order.

30. Following no response from the Charterers and advice from the Owners that no service of Defence Submissions had been received, on 15th July 2008 by e-mail the Tribunal made a Final and Peremptory Order for such service by 21st July 2008. Failing such service within the time limit set, the Tribunal warned the Charterers that it would then proceed to its award on the claimants' documents and submissions alone to the exclusion of all others. This message also made it clear that any submissions made by either party after 21st July 2008 would not receive any consideration. The Tribunal also reminded the Charterers of the provisions of English law, as set out in its message of 6th July 2008, as above.

31. Finally, following advice from the Owners that no service of Defence Submissions had been made, on 22nd July 2008, the Tribunal sent the following message to the Charterers by e-mail, with a copy to the Owners' solicitors – *"Regrettably you have failed to respond within*

12/08 2008  19:12    01245361093                    ATTICA ASSOCIATES                          PAGE  10

*the time limit set in the Final and Peremptory Order and I can therefore confirm that the Tribunal is now proceeding to its Award on the documents and submissions presently before us to the exclusion of all others.".*

32. The Tribunal therefore considered, in the light of the steps that had been taken, that the Charterers had been given every opportunity to participate fully in the procedure of this Arbitration but had decided not to do so. Consequently, it was appropriate for the Tribunal to proceed to its Final Award, notwithstanding the absence of any submissions from the Charterers.

33. The Tribunal has therefore proceeded to consider the dispute on the basis stated, neither party having made a request for an oral hearing.

## THE FINDINGS OF THE TRIBUNAL

34. We are satisfied that a fixture was concluded between the parties on the terms contained in the e-mail mentioned in Paragraph 2 above and confirmed by the many subsequent exchanges between the two parties, as also evidenced above.

35. We will deal with the various parts of the Owners' claim as follows:-
    1) Demurrage in the amount of US$444,086.81;
    2) Freight in the amount of US$105,000.00;
    3) Detention in the amount of US$805,635.42;
    4) Port disbursements in the amount of US$139,350.00;
    5) Damages in the amount of US$105,000.00; and
    6) Interest and costs.

### 1) DEMURRAGE

36. The Laytime allowed to the Charterers in the fixture was
    *"72 HRS SHINC*
    *LAYTIME TO BE REVERSIBLE*
    *DEMURRAGE: USD 5,500 PDPR"*

37. The Asbatankvoy form of Charter Party, which was not amended by the recapitulation, contained the following clauses:-

## "PART II CLAUSE 6 - NOTICE OF READINESS

*Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sea loading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime."*

## "PART II CLAUSE 7 - HOURS FOR LOADING AND DISCHARGING

*The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime."*

## "PART II CLAUSE 8 - DEMURRAGE

*Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified, if, however, demurrage shall be incurred in ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.*

## "PART II CLAUSE 9 - SAFE BERTHING - SHIFTING

*The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterers, provided the vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another......... Time consumed on account of shifting shall count as used laytime......."*

> **"PART II CLAUSE 12 – DUES, TAXES, WHARFAGE**
>
> *The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelen Habilitation Tax, C.I.M. taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading and discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.*

38. The Owners presented full documentation with their Claim Submissions, including Laytime Calculations and Statements of Facts for both the loading and discharging of the cargo in Misurata. The total laytime allowed to the Charterers as per the fixture recapitulation was 72 running hours SHINC and the Owners calculated that the allowed laytime expired at 18.40 hours on 17th October 2007. Consequently, demurrage accrued continuously from that time until 18.00 hours on 25th December 2007, a total of 68 days 23 hours 20 minutes [68.972222 days] which, at the agreed Charter Party daily rate of demurrage of US$5,500 per day and pro rata, amounted to US$379,347.22 demurrage due to them.

39. According to the Statement of Facts, signed both by the Master and the Shipper/Receiver, the vessel arrived at 14.00 hours on 14th October 2007 and the Notice of Readiness [NOR] was tendered at the same time. The vessel remained at the anchorage until 14.00 hours on the 16th October, at which time the vessel shifted to a berth, where she arrived and was all fast at 15.20 hours on the same day. In accordance with Clause 6 of Part II of the subject Charter Party, the laytime commenced 6 hours after the vessel's arrival at the anchorage but was temporarily suspended from 14.00 hours on 16th October whilst the vessel shifted to the berth, laytime resuming to count on arrival there at 15.20 hours on the same day. Loading was commenced at 17.20 hours on 16th October and hoses were disconnected at 16.10 hours on 20th October. The allowed laytime of 72 running hours therefore expired at 21.20 hours on 17th October 2007 and demurrage started to accrue from that point in time.

10

40. In their invoices for demurrage, as above, the Owners appear to have started laytime as
    various times, at 20.00 hours in the invoice of 25th October and at 18.00 hours in their
    subsequent invoices of 20th November, 10th and 25th December 2007. Whilst there were
    some interruptions during the loading operation, these were all at the request of the shore
    and did not stop the counting of laytime. We should also point out that the Asbatankvoy does
    not allow laytime exceptions to apply during time on demurrage unless the Charter Party so
    amends. In the subject Charter Party, there was no such amendment.

41. The Owners based their total demurrage claim up until the discharging of the cargo in
    Misurata was completed and hoses disconnected at 12.30 hours on 6th January 2008. This,
    the Owners claimed, resulted in a claim for 80.74305555 days, which at the Charter
    demurrage rate of US$5,500.00 per days and pro rata, amounted to US$444,086.81.

42. Our calculations differed slightly, as shown above, and we calculate that the Owners have a
    claim for 80.63194444 days or US$443,475.69. This is the amount we have awarded.

## 2) FREIGHT

43. The Charter Party contains the following clause:-

> **"PART II CLAUSE 2 – FREIGHT**
> *Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity
> (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection.
> Payment of freight shall be made by Charterer without discount <u>upon delivery of cargo at
> destination</u> ...."*[our underlining]

44. It is clear from Clause 2 that the freight is only earned once the cargo has been delivered to
    its destination, in this case, a port in Malta. The cargo was discharged at the port of loading
    and was never delivered to Malta. In consequence, no freight is due to the Owners and
    therefore we rejected the Owners' claim for freight.

45. However, we are of the view that the Owners are entitled to damages in lieu of freight, both
    on the first and second consecutives voyages provided for in the Charter Party. These
    damages must be limited to the actual profit accruing to the Owners, on each voyage, after all
    the expenses incurred in carrying the two cargoes to their destination are deducted. We do
    not have evidence before us to award such amounts but we hereby reserve our jurisdiction to
    so award if the necessary evidence is submitted to us at a later date.

### 3) DETENTION

46. The Owners claimed that they are entitled to detention from the moment when the
discharging was completed and hoses disconnected at Misurata at 12.30 hours on 6th January
2008. They also note that it is common for the English courts to award detention damages at
the demurrage rate. Accordingly, they have so claimed from 12.30 hours on 6th January
2008 until 24.00 hours on 31st May 2008,  a total of 146 days 11 hours 30 minutes
(146.47916667 days). At the daily demurrage rate of US$5,500.00, this amounts to
US$805,635.42. We agree with their reasoning and their calculations and have awarded this
part of their claim in full. However, it is our understanding that the vessel remains detained
in Libya and we hereby reserve our jurisdiction to consider the quantum of any detention
subsequent to 31st May 2008 if the necessary evidence is submitted to us at a later date.

### 4) PORT DISBURSEMENTS

47. The Owners made a claim in the amount of US$139,350 for port disbursements which, they
averred, were incurred as a result of the Charterers' default which led to the vessel's
detention in Misurata. Whilst we are convinced that some of that amount was legitimately for
the Owners' account, they produced in evidence a letter from the Charterers dated 14th
November 2007 in which the latter stated that *"Regarding the stated port charges, penalty
and agency fees of US$ 139,350 we are advised that up till yesterday, the amount is
US$200,000. This charge will be paid by us/supplier of cargo."*. In these circumstances, we
have awarded the Owners the amount they have claimed. However, in view of the possible
further escalation of these costs, we hereby reserve our jurisdiction to consider the quantum
of any such escalation if the necessary evidence is submitted to us at a later date.

### 5) DAMAGES

48. As we have stated above in dealing with the claim for freight, we cannot award the Owners
damages to the full extent of the freight for the two voyages under the Charter Party because
the earning of such freight would inevitably have incurred costs for the Owners. The
damages must be limited to the actual profit accruing to the Owners, on both voyages, after
all the expenses incurred in carrying those cargoes to their destination are deducted. We do
not have evidence before us to award such amounts but we hereby reserve our jurisdiction to
so award if the necessary evidence is submitted to us at a later date.

49. The Arbitration Act 1996 gives the Tribunal the power to award simple or compound interest from such dates, at such rates and with such rests as it considers meets the justice of the case. We find that the appropriate rate of interest is 6.00% per annum and pro rata, compounded on a three monthly basis commencing on 15th January 2008 (being a reasonable time after the date of the Owners' final invoice for the demurrage) until date of payment.

50. There being no reason to depart from the general rule that costs should follow the event, the Tribunal has awarded the Owners their costs on the standard basis.

**NOW WE** the said Timothy Rayment, Timothy Marshall and Colin Peerless, having taken upon ourselves the burden of this reference and having considered the written evidence and submissions made to us, having conferred each with the other and finding ourselves in agreement and, for the above reasons, **DO HEREBY MAKE, ISSUE AND PUBLISH** this our **JOINT AND AGREED AWARD** as follows:-

**A)   WE FIND AND HOLD** that the Owners' claims succeed as follows:-

1) In respect of demurrage in the amount of US$443,475.69 and no more;

3) In respect of detention in the amount of US$805,635.42; and

4) In respect of port disbursements in the amount of US$ 139,350.00.

In respect of any further evidence of detention in 3) beyond 31st May 2008, as above and of any further escalation of the disbursements in 4) above, we hereby reserve our jurisdiction to determine the quantum of such additional detention and costs to be published in the form of an Award or Awards, if not agreed.

**B)   WE FIND AND HOLD** that the Owners' claims in respect of:

2) freight in the amount of US$105,000.00 fails and is hereby dismissed; and

5) damages for each consecutive voyage succeed although not in the sums claimed.

12 09 2008  19:12    01245361093    ATTICA ASSOCIATES    PAGE  16

In respect of 5) above, we hereby reserve our power of jurisdiction to determine the quantum of such damages at a later date, to be published in the form of an Award or Awards, if not agreed.

**C)** **WE AWARD AND DIRECT** that the Charterers shall forthwith pay to the Owners the sum of US$1,388,461.11 (One Million Three Hundred and Eighty Eight Thousand Four Hundred and Sixty One United States Dollars and Eleven Cents), together with interest thereon at the rate of 6.00% per annum and pro rata compounded on a three monthly basis from 15th January 2008 (being a reasonable time after the date of the Owners' final invoice for the demurrage) until date of payment.

**D)** **WE FURTHER AWARD AND DIRECT** that the Charterers shall bear and pay their own and the Owners' costs of the reference, the quantum of such recoverable costs to be determined by us if not agreed, for which determination we hereby reserve our jurisdiction, and that the Charterers shall bear and pay the costs of this our Award in the sum of £4,650.00 (Four Thousand Six Hundred and Fifty Pounds Sterling), inclusive of our fees, interlocutory charges and disbursements **PROVIDED,** however, that if, in the first instance, the Owners shall have paid all or any part of the costs of this our Award, they shall be entitled to an immediate reimbursement by the Charterers of the sum so paid, together with interest thereon, calculated at the rate of 7.00% per annum and pro rata, compounded on a three monthly basis, from the date of payment until the date of reimbursement in full by the Charterers to the Owners.

GIVEN under our hands this.............day of ...............2008

**TIMOTHY RAYMENT**

**WITNESS**

TR Marshall

**TIMOTHY MARSHALL**

**WITNESS**

**COLIN PEERLESS**

**WITNESS**

14

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN

## Naftaservice Trading (Cyprus) Ltd. of Cyprus

Claimants
*(Disponent Owners)*

## AND

## Alaric Consulting and Investment Corp. Ltd. of Malta

Respondents
(Charterers)

### m.t. "TROODOS"

### Charter Party dated 9th October 2007

---

## FINAL ARBITRATION AWARD

---

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
NAFTASERVICE TRADING (CYPRUS) LTD.,
                              *Plaintiff*,                    08 CV 0317 (SAS)

v.

                                                             <u>DEFAULT JUDGMENT</u>

ALARIC CO. LTD. and ALARIC CONSULTING
& INVESTMENT CORPORATION LIMITED,
                              *Defendant.*
-------------------------------------------------------x

This action having been commenced on January 14, 2008, by the filing of the Verified

Complaint, and a copy of the Verified Complaint having been personally served on the

defendants, ALARIC CO. LTD. and ALARIC CONSTULING & INVESTMENT

CORPORATION LIMITED, on April 21, 2008, and proof sufficient to this Court that service

had been completed in accordance with Rule B(2) having been filed on August 4, 2008, the

defendants not having answered the Verified Complaint, moved or otherwise appeared in these

proceedings, and the time for answering the Verified Complaint having expired, it is

ORDERED, ADJUDGED AND DECREED: That the plaintiff have judgment against

defendants, ALARIC CO. LTD. and ALARIC CONSTULING & INVESTMENT

CORPORATION LIMITED, and that a judgment of the Court be granted in Plaintiff's favor;

that garnishee bank, HSBC Bank, is hereby ordered to pay the Plaintiff US$ 215,000.00,

representing the funds restrained pursuant to the Order for Issuance of Process of Maritime

Attachment and Garnishment issued by this Court on January 15, 2008, to an account to be

provided by Plaintiff's counsel in partial satisfaction of the London Arbitration Award; and that

defendants, ALARIC CO. LTD. and ALARIC CONSTULING & INVESTMENT

CORPORATION LIMITED, pay the costs and reasonable attorney's fees associated with this

Verified Complaint, all together with post-judgment interest.

Dated: August _____, 2008
       New York, New York

_____
Honorable Shira A. Scheindlin,
United States District Judge

This document was entered on the docket on

_____.